NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

VIRGINIA SURETY COMPANY, INC.     )
     )
     Plaintiff,     )     Hon. Garrett E. Brown, Jr.
     )
     v.     )     Civil Action No. 08-5586 (GEB)
     )
JACK MACEDO, SANDRA     )     <u>**MEMORANDUM OPINION**</u>
MACEDO-BILYNSKY, CARLOS PEIXOTO,     )
MACEDOS CONSTRUCTION CO., INC. OF     )
NEW JERSEY, C.C.S. SERVICES OF EAST     )
HANOVER, INC., JOSE MOREIRA, and     )
JANE DOES 1-3,     )
     )
     Defendants.     )
_____)

**BROWN**, **Chief Judge:**

     This matter comes before the Court on the renewed motion to dismiss (Doc. No. 68) filed

by Defendants Jack Macedo, Sandra Macedo-Bilynsky, Macedos Construction Co. Inc., of New

Jersey, and C.C.S. Services of East Hanover, Inc. and joined by Defendant Carlos Peixoto

(collectively "Macedos Defendants"), and the renewed motion to dismiss (Doc. No. 67) filed by

Defendant Jose Moreira.  The Court has considered the parties' submissions and decided the

matter without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the following

reasons, the Court will deny Defendants' motions.

## I.     BACKGROUND

     For the purpose of this motion, the Court accepts as true the factual allegations in the

Amended Complaint and draws all reasonable inferences in favor of Plaintiff.  *See*, *e.g.*, *Ashcroft*

*v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  This matter arises from an October 2005 residential

construction project accident and involves allegations of insurance fraud by an insurance company against an insured construction company and an injured carpenter.  Plaintiff Virginia Surety Company, Inc. ("VSC") issued a workers' compensation policy and a commercial general liability (CGL) policy to Defendant Macedos Construction Company Inc. of New Jersey (MCC), a New Jersey corporation that performed commercial concrete construction work, that was in effect at the time of the accident.  Defendant C.C.S. Services of East Hanover, Inc. (CCS) was effectively a subsidiary of MCC owned in whole or part by members of the Macedo family. (Am. Compl. ¶¶ 7–10, 18–21.)  VSC alleges that MCC, CCS, various individuals who are principals and employees with these companies, and Jose Moreira, the injured carpenter, engaged in a scheme to procure workers' compensation benefits for Moreira, despite the fact that Moreira did not work for MCC, and despite the fact that MCC was not the contractor for the construction project.

According to the Amended Complaint, Defendant Carlos Peixoto and his wife purchased undeveloped real property at Block 27, Lot 115.01, 1 Parsonage Lot Road in Tewksbury, New Jersey, and in the fall of 2005, were in the process of building a family residence on the property (hereinafter the "Parsonage Lot Property").  At the time of this residential construction project, Peixoto was employed by MCC as a foreman.  While the residence was in development, Peixoto and his wife resided at 7 Dell Road in Stanhope, New Jersey.  The construction permits issued by Tewksbury Township in November 2004 and April 2005, Permit Nos. T-04-516 and T-04-516+A, listed Peixoto as the "Contractor" for the home construction project at the Property and did not list MCC as a contractor.  (Am. Compl. ¶¶ 26–41.)  According to VSC, in September 2005, Peixoto asked two MCC employees if they could recommend any carpenters for the

2

building of the home.  (*Id.* ¶¶ 48–49.)  These employees referred Peixoto to Manuel Covas (*id.* ¶ 50), and Peixoto hired Covas and his co-worker Moreira to provide carpentry services for the home construction project (*id.* ¶ 54).  VSC alleges that Moreira and Covas were employed by D. Reis Contracting and its owner Dominick Reis when they began working on the Parsonage Lot Property.  (*Id.* ¶¶ 42–47.)  On October 1, 2005, while working at the Property, Moreira climbed onto a raised scaffold approximately 25 feet above the ground, and the scaffolding collapsed, causing Moreira to fall to the ground and suffer substantial injuries requiring hospitalization.  (*Id.* ¶¶ 63–66.)  Because of these injuries, Moreira has been unable to work since the incident.

MCC, through its co-manager Sandra Macedo-Bilynsky, filed workers' compensation and CGL claims under the VSC policies on behalf of Moreira, representing that he was a covered employee for the job.  As a result of this and other representations, VSC paid $284,698.83 to Moreira in workers' compensation benefits and another $31,891.97 defending MCC from a collateral lawsuit filed by Moreira.  (*Id.* ¶ 337.)  On July 30, 2007, Moreira and his wife filed suit in Superior Court, Law Division, Huntington County, Docket No. L-464-07 against MCC, Peixoto, and others alleging negligence and loss of consortium (hereinafter "*Moreira* action").  In conjunction with the *Moreira* action, Moreira filed a certification indicating that he had never worked for MCC.  VSC responded by filing this federal action alleging that Defendants fraudulently conspired to provide insurance coverage for Moreira's injuries under MCC's policies.  (*See* RICO Statement at 22.)  VSC's original Complaint asserted claims under the federal Racketeering Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1962(c), (d), and various fraud-based state-law claims, against the Macedos Defendants (Macedo, Macedo-Bilynsky, MCC, CCS, and Peixoto), Moreira, and Moreira's wife Rosa Gomes.  VSC

3

also sought declaratory relief voiding and rescinding coverage for the Moreira claims.  All

Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  In an

Order issued September 29, 2009, and Opinion issued September 30, 2009, then United States

District Judge and now Circuit Judge Joseph A. Greenaway, Jr., granted Defendants' motion to

dismiss without prejudice.[1] *Va. Surety Co. v. Macedo*, No. 08-5586, 2009 WL 3230909 (D.N.J.

Sept. 30, 2009).  Judge Greenaway primarily concluded that VSC failed to plead its RICO and

state-law fraud causes of action with sufficient particularity to satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b).  *Id.* at *7–8, *10–12.  Judge Greenaway

also stated that misrepresentations concerning Moreira's employment relationship with MCC

were "not actionable as mail and wire fraud," because New Jersey law treats employment status

as a mixed question of law and fact.  *Id.* at *8.  In December 2009, VSC filed an Amended

Complaint.  While its initial complaint contained RICO claims against Macedo, Macedo-

Bilynsky, and Peixoto, VSC's Amended Complaint only includes a RICO claim against Macedo-

Bilynsky.  VSC also asserts claims of statutory insurance fraud, statutory workers' compensation

fraud, common law fraud, fraud-based unjust enrichment, and conspiracy to defraud against all

Defendants.  Finally, VSC seeks various forms of declaratory relief rescinding and voiding

coverage for Moreira under the insurance policies.  VSC no longer asserts any claims against

Moreira's wife, Rosa Gomes.  Defendants renewed their motions to dismiss.

By Opinion and Order of August 27, 2010, this Court denied the Defendants' renewed

motions to dismiss without prejudice and ordered VSC to file a RICO Case Statement pursuant

to Local Civil Rule 16.1(b)(4).  VSC timely filed the RICO Statement, and Defendants renewed

---

[1]By order of April 14, 2010, this matter was reassigned to the undersigned.

their motions to dismiss.  Defendants primarily argue that Judge Greenaway's September 29,

2009 Opinion is law of the case and requires dismissal of VSC's amended fraud claims, because

representations regarding Moreira's employment status are not actionable as fraud.  Defendants

further argue that VSC's pleadings do not satisfy the heightened pleading requirements of

Federal Rule of Civil Procedure 9(b), or even the plausibility standard applicable under Rule

12(b)(6).  Defendants also attack VSC's claims that are predicated on various Defendants'

statements in legal filings before the state Workers' Compensation Division and in the *Moreira*

action in state court, on the ground that such statements are shielded by the litigation privilege

and the *Noerr-Pennington* doctrine.  VSC responds that Judge Greenaway's opinion does not

control their amended pleadings of fraud, that their amended claims satisfy applicable pleading

requirements, and that the litigation privilege and *Noerr-Pennington* doctrine do not apply to the

fraudulent court filings at issue in this case.

  This Court has subject matter jurisdiction over VSC's RICO claim pursuant to 18 U.S.C.

§ 1964(c) and 28 U.S.C. § 1331, and supplemental jurisdiction over VSC's state law claims

pursuant to 28 U.S.C. § 1367.

## II. RICO CASE STATEMENT

  According to VSC's RICO Statement, Moreira and Covas began work on the Parsonage

Lot Property on September 24 and 25, 2005.  Covas received payment for these services via a

check drawn on the personal bank account of Peixoto and his wife.  Moreira sustained the

relevant injuries on the third day of work at the Parsonage Lot Property, October 1, 2005.

Shortly after the injury occurred, Peixoto visited Moreira in the hospital and informed him that

MCC would be covering payments for his injuries.  (RICO Statement at 2; Am. Compl.

¶¶ 57–58, 61–64, 67–68.)  VSC avers that MCC, through its principals Sandra Macedo-Bilynsky and Jack Macedo—who are Peixoto's sister-in-law and father-in-law, respectively—conspired with Peixoto and Moreira to submit false claims based on fraudulent documentation for the purpose of procuring insurance coverage for Moreira's injuries and shielding Peixoto from liability for the same.  (*See* RICO Statement at 3, 22.)

VSC provides specific details about each Defendant's role in the alleged conspiracy. Beginning with Macedo-Bilynsky, VSC claims that this Defendant was the co-manager of MCC who conducted the daily administration of MCC's construction business, was involved in the procurement of the VSC insurance policies, and served as the primary contact for MCC's insurance broker.  VSC alleges that Macedo-Bilynsky committed at least six fraudulent acts in the furtherance of the enterprise.  First, VSC asserts that she completed and submitted a Worker's Compensation First Notice of Claim via MCC's insurance broker that falsely stated: (i) that Moreira was a full-time carpenter hired by MCC on October 1, 2005 (the date of injury); and (ii) that MCC paid Moreira at a rate of $61.25 per hour / $2,450 per week.  (RICO Statement at 5; Am. Compl. ¶¶ 71–81.)  Second, VSC alleges that Macedo-Bilynsky caused MCC's insurance broker to submit a claim under the CGL policy on October 10, 2005.  (RICO Statement at 6; Am. Compl. ¶¶ 86–87.)  Third, VSC states that Macedo-Bilynsky sent a false construction agreement bearing the date March 15, 2004 (hereinafter "2004 construction agreement") to VSC's claims administrator on January 24, 2007, as proof that MCC had a construction agreement with Peixoto to be the general contractor on the Parsonage Lot Property at the time of Moreira's injury.  (RICO Statement at 6; Am. Compl. ¶¶ 104–05.)  Fourth, VSC avers that Macedo-Bilynsky sent VSC a false W-2 tax form on January 24, 2007, which stated that CCS (an

MCC subsidiary) was Moreira's employer, and that Moreira had yearly earnings from CCS totaling $367.50.  (RICO Statement at 7; Am. Compl. ¶¶ 113–15.)  Fifth, VSC contends that Macedo-Bilynsky filed an Answer on behalf of MCC on or about February 2, 2007, in response to a Claim Petition filed in the State Department of Labor, Workers' Compensation Division, that failed to indicate whether Moreira was an MCC employee, whether his injury arose from his employment, and listed his occupation as "Under Investigation."  (RICO Statement at 7; Am. Compl. ¶¶ 118–19.)  Finally, VSC alleges that Macedo-Bilynsky prepared and submitted a false certification to the Superior Court in the *Moreira* action on or about March 20, 2008, which stated that Moreira was a non-union MCC employee at the time of his injury, whose pay was processed by CCS.  (RICO Statement at 8; Am. Compl. ¶¶ 124–27.)  VSC contends that these representations were fraudulent because: (1) Moreira was a full-time employee of D. Reis Contracting at the time of his injuries; (2) Moreira was hired by Peixoto to perform carpentry services for $7,500 and began work on September 24, 2005; (3) Moreira and Covas were paid for their services at the Parsonage Lot Property by a personal check from Peixoto's bank account; (4) neither Moreira nor Covas ever received payment from MCC or CCS; (5) the Tewksbury Township construction permits indicate that Peixoto was the general contractor for the residential construction project; (6) MCC represented on its insurance applications that it only performed commercial concrete construction work; and (7) the putative 2004 construction agreement between MCC and Peixoto listed the Parsonage Lot Property as Peixoto's mailing address, despite the fact that the residence had not been completed and was not habitable at the time of the alleged construction agreement.  (*See* RICO Statement at 5–9.)

As for Defendant Peixoto, an MCC foreman and the property owner where the accident

occurred, VSC alleges that this Defendant conspired with Macedo-Bilynsky and his father-in-law "to fraudulently induce coverage from VSC" through the submission of the aforementioned false documents because he did not possess a homeowner's insurance policy that would provide coverage for the injuries sustained by Moreira. (*Id.* at 10.) In the furtherance of this enterprise, VSC avers that Peixoto met with Moreira in the hospital shortly after the injury occurred to inform him that MCC would be covering payments for his injuries. (*Id.*; Am. Compl. ¶¶ 67–68.) VSC contends that these acts were fraudulent, because the Tewksbury Township construction permits unambiguously listed Peixoto as the property owner and general contractor. (RICO Statement at 10.)

With regard to Defendant Jack Macedo, Peixoto's father-in-law and the principal and/or owner of MCC, VSC alleges that this Defendant participated in the conspiracy by executing the false 2004 construction agreement (subsequently submitted to VSC) between MCC and Peixoto after Moreira's injury occurred in October 2005. (*Id.* at 8–9; Am. Compl. ¶ 111.) Furthermore, after Moreira instituted the state court action against MCC, VSC alleges that this Defendant arranged a meeting with Moreira and Moreira's then-current employer, Dominick Reis (coincidentally Macedo's brother-in-law), at "Churrasqueira Bairrada" restaurant in February 2008. At this meeting, VSC alleges that Macedo attempted to persuade Moreira to abandon the state court action against MCC and pursue the workers' compensation benefits from VSC. (RICO Statement at 9; Am. Compl. ¶¶ 133–47.)

Finally, as for Defendant Moreira, the injured carpenter, VSC alleges that this Defendant participated in the enterprise by completing and submitting Workers Compensation Claim No. 0028139132 Questionnaire to VSC's claims administrator on October 14, 2005, which falsely

stated that he was an employee hired by MCC on October 1, 2005.  Thereafter, VSC asserts that

Moreira completed and submitted an Employee's Claim Petition to the New Jersey Division of

Workers' Compensation that contained a false statement regarding his gross weekly wages from

his employment with MCC.  (RICO Statement at 11; Am. Compl. 88–99.)  Moreira subsequently

filed a certification in Superior Court in the *Moreira* action generally denying that he worked for

MCC or CCS.  (RICO Statement at 11–12.)  Specifically, Moreira certified the following facts:

(1) that he and Covas were hired to perform carpentry work on the Parsonage Lot Property by

Peixoto on or about September 17, 2005; (2) that he and Covas worked on the property the

weekend prior to the incident, September 24–25, 2005; (3) that all materials related to his work

on the property were provided by Peixoto, the property owner; (4) that he received no paycheck

from MCC for his work prior to the incident, but that Covas received payment from Peixoto and

his wife; (5) that he "first learned that [he] would be treated as if [he] was an employee of

[MCC]" while he was in the hospital receiving treatment for his injuries, whereupon he was told

that MCC would provide workers' compensation benefits to cover the expenses of his injuries;

(6) that he never received a W-2 tax form from MCC; (7) that "at no point in time, up to and

including the date of the incident, did [he] understand to be employed through [MCC] or did

anyone from [MCC] retain control over [his] conduct, prescribe the manner in which [his] work

was performed [] while on the [Parsonage Lot] Property"; and (8) that he was subsequently

provided with a W-2 tax form, ostensibly issued by CCS, during discovery, but that he "[was] not

familiar with such an entity nor was [he] employed by them."  (RICO Statement at 11–12; Am.

Compl. ¶ 153 (quoting Mills Decl. Ex. B (Moreira Certif.)).)

　　　　Based on these allegations, VSC submits that Defendant Macedo-Bilynsky engaged in the

following RICO predicate acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343: (1) wire submission of the false Workers Compensation First Notice of Claim, on behalf of MCC, to VSC via MCC's insurance broker on or about October 5–6, 2005; (2) wire and/or mail submission of the false Acord General Liability Notice of Occurrence Form, on behalf of MCC, to VSC via MCC's insurance broker on or about October 10, 2005; (3) wire and/or mail submission of the false 2004 construction agreement, allegedly prepared after-the-fact by Defendant Jack Macedo, to VSC on or about January 24, 2007; and (4) wire and/or mail submission of a false 2005 W-2 tax form indicating that Moreira worked for and earned income from MCC's subsidiary CCS, to VSC on or about January 24, 2007.  (RICO Statement at 13–14.) VSC asserts that Defendants MCC, CCS, Macedo, Macedo-Bilynsky, and Peixoto formed an association-in-fact enterprise, and VSC contends that they have sufficiently alleged a "pattern of racketeering activity" under 18 U.S.C. § 1961(5), because they have alleged multiple predicate acts within a ten-year period, and the predicate acts are related and continuous.

## III.   SUPERIOR COURT'S DECISION ON VSC'S CLAIMS

After the renewed motions to dismiss were initially filed with this Court, the Superior Court in the *Moreira* action decided similar motions filed by the Defendants in this case, which sought to dismiss VSC's fraud-based claims.[2]  As they do with the present motions, the defendants had relied on Judge Greenaway's September 29, 2009 Opinion that the representation regarding employment status could not be actionable as fraud, and that certain statements made during the course of litigation were protected by the litigation privilege and the *Noerr-*

---

[2]The Court understands that VSC, as a defendant in the *Moreira* action, presented all of the same fraud claims, as counterclaims, that they pled in this case, with the exception of the federal RICO claim.

*Pennington* doctrine. By opinion and order of June 11, 2010, the Honorable Peter A.
Buchsbaum, J.S.C., denied the Peixotos and Macedos defendants motions. (Mills Decl. Ex. D at
11–16.) Applying the motion to dismiss standard, Judge Buchsbaum concluded that VSC's
allegations stated claims for insurance fraud under N.J. Stat. Ann. § 17:33A-1 et seq., workers'
compensation fraud under N.J. Stat. Ann. §§ 34:15-1 et seq. and 34:14-57.4, common law fraud,
unjust enrichment, and civil conspiracy. (*Id.*) Judge Buchsbaum specifically rejected these
defendants' litigation privilege and *Noerr-Pennington* arguments, noting that these doctrines did
not provide protection to "shams," and stating that he was unaware of any First Amendment right
or privilege that would protect fraud on the court. (*Id.* at 13–14 ("While defamatory statements
may be protected, on free speech grounds, the extension of that protection to allegations of
outright fraud designed to in effect steal from an insurance company would be breathtaking.").)
Judge Buchsbaum also rejected defendants' contention that Judge Greenaway's September 29,
2009 opinion controlled the disposition of VSC's counterclaims, making the following
observations:

> The arguments as to whether Moreira was an 'employee' overly
> complicate the allegation that factually he did not work for Macedos in
> any way, and notwithstanding that fact, the defendants allegedly came
> together, *created a false* employment contract, and falsely stated Moreira
> worked for Macedos in order to obtain insurance benefits. There are
> factual questions for a jury not technical legal conclusions amounting to
> opinion. Involved are not arcana of employment law, but whether there
> was a scheme to cook up a wholly fictional relationship in order to obtain
> insurance. The ink spilled on the status of 'employment' as a matter of
> law is thus irrelevant to the actual allegations.

> . . . [I]t is far from clear that Judge Greenaway's past ruling on the
> employment issue would control. His opinion does not directly focus on
> that issue. In fact, the portion of Judge Greenaway's opinion dealing with
> state fraud claims does not mention the employment issue at all.

> . . .
>
> . . . Although the defendants argue issues of law cannot constitute the basis for fraud, that argument contradicts the Court's holding in *Westervelt v. Demarest*, 46 <u>N.J.L.</u> 37, 40 (1884). Furthermore, VSC alleged a misrepresentation other than employment status in the form of a lack of information with the insurance application as to residential projects. [citations omitted] In addition, reading the pleadings with a generous and hospitable view, as the Court must, the focus of VSC's claims appears to be whether Moreira worked for Macedos in any capacity, not just within the legal definition of an employee.

(*Id.* at 11–14.)

## IV.    MOTIONS TO DISMISS

Defendants argue that VSC's claims are barred by the law of the case, Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), the litigation privilege, and the *Noerr-Pennington* doctrine. This Court disagrees on each point.

### A.  *Law of the Case*

The law of the case doctrine instructs a court to continue to apply a ruling of law decided at an earlier stage in the litigation at subsequent stages. *See, e.g.*, Arizona *v. California*, 460 U.S. 605, 618 (1983). The doctrine "reflects courts' general reluctance to reconsider matters soundly decided," *Falor v. G & S Billboard*, Civ. No. 04-2373, 2008 WL 5190860, at *2 (D.N.J. Dec. 10, 2008), and "is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity," *In re City of Phila. Litig.*, 158 F.3d 711, 717–18 (3d Cir.1998). Much like the standard for a motion for reconsideration, a court will only abandon a prior legal ruling under the following "extraordinary circumstances": where "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *In re City of Phila. Litig.*, 158 F.3d at 718 (citing *Pub. Interest*

*Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116–17 (3d Cir.1997));

*see also Falor*, 2008 WL 5190860, at *2 ("In many ways, 'law of the case' disputes are the

opposite side of the motion for reconsideration coin.  The only difference between the two is the

filing party: prevailing parties or similarly-situated parties seek to apply the 'law of the case'

against subsequent parties in similar circumstances, and losing parties seek reconsideration of the

adverse decision.").  However, the doctrine only applies to legal conclusions, and does not apply

to dicta.  *See, e.g.*, *In re City of Phila. Litig.*, 158 F.3d at 718; *Falor*, 2008 WL 5190860, at *2;

Wright & Miller, Federal Practice and Procedure § 4478.

Having reviewed the parties' arguments, this Court agrees with VSC and Judge

Buchsbaum that Judge Greenaway's September 29, 2009 opinion does not control the amended

pleadings now pending before the Court.  Defendants' myopic focus on VSC's allegations

regarding Moreira's employment status miss the broader scope of VSC's allegations—that

Moreira never worked for MCC in any capacity, that MCC was not even the general contractor

for the residential project at the Parsonage Lot Property, and that MCC's principal created a

construction contract after-the-fact to cover the conspirators' tracks.  This Court agrees with

Judge Buchsbaum that "[t]he arguments as to whether Moreira was an 'employee' overly

complicate the allegation that factually he did not work for Macedos in any way."  (Mills Decl.

Ex. D at 11.)  The portion of Judge Greenaway's opinion relied on by Defendants (i.e., that

representations regarding employment status are not actionable as fraud) does not address the full

canvas of VSC's allegations of fraud as set forth in the pleadings currently before the Court, but

only addresses the narrow universe of Defendants' representations about Moreira's employment

status.  Furthermore, it is unclear whether this portion of Judge Greenaway's opinion is dicta,

because the opinion appears to present this reasoning as alternative grounds for dismissal of the federal wire and mail fraud claims (the primary ground appears to be Rule 9(b)'s heightened pleading standard), but then does not refer to this issue in dealing with VSC's state law fraud claims, which are predicated on the same misrepresentations. *See Virginia Sur. Co.*, 2009 WL 3230909, at *8–12.  The amended claims of fraud do not rely on lay persons' legal opinions regarding an individual's employment status.  Rather, they provide broad and detailed allegations that Defendants conspired to concoct an entire employment relationship, as well as a construction agreement, after Moreira sustained his injuries.  The Court agrees with Judge Buchsbaum that Judge Greenaway's opinion does not control the amended pleadings.  Consequently, the amended pleadings, which include the RICO Statement, must be viewed under the standards for Rules 8, 9(b), and 12(b)(6).

### B.  Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may only be granted if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  The plausibility standard requires that "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.

Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  These pleading requirements under Rule 12(b)(6) derive from Rule 8's requirement that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies to VSC's claims, which sound in fraud.  *See, e.g.*, *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004) (applying Rule 9(b) to federal RICO claims based on mail and wire fraud); *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99 (3d Cir. 1983) (applying Rule 9(b) to state-law fraud claims).  Accordingly, VSC "must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The Third Circuit has held that "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations omitted); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ("[T]he plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.").  This heightened pleading standard is designed "to ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard

defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

Plaintiff's Amended Complaint contains numerous claims, consisting of New Jersey insurance fraud, workers' compensation fraud, common law fraud, and unjust enrichment claims against Defendants Moreira, Peixoto, Macedo-Bilynsky, Macedo, MCC, and CCS respectively, one RICO claim against Macedo-Bilynsky, one civil conspiracy claim against all Defendants, and four counts seeking declaratory relief under their insurance policies.  The Court considers the RICO, state law, and declaratory judgment claims in turn.

### 1. RICO

#### a. RICO Standards

RICO prohibits certain racketeering activities established under 18 U.S.C. § 1962, and the statute authorizes a civil action for "[a]ny person injured in his business or property by reason of section 1962."  18 U.S.C. § 1964(c).  VSC alleges violations of § 1962(c) and (d).[3]  Section 1962(c), the primary violation upon which the parties focus most of their attention, prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Section 1962(d) prohibits any person from conspiring to violate any of the subsections of § 1962.  While the primary congressional purpose in enacting RICO was "to seek

---

[3]Although the Amended Complaint also appears to allege a claim under § 1962(b), VSC's RICO Statement unambiguously abandons that claim.  (RICO Statement at 25–26.)

16

the eradication of organized crime in the United States," Pub. L. No. 91-452, 84 Stat. 922, 922-23 (1970), Congress mandated that RICO "be liberally construed to effectuate its remedial purposes," *id.* at 942. Therefore, the Supreme Court has generally held that RICO must be liberally applied, and that it reaches legitimate businesses and enterprises, operating with and without a profit motive. *See, e.g.*, *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985). However, while the Supreme Court has reaffirmed the liberal construction of RICO, it has cautioned that such a reading is "not an invitation to apply RICO to new purposes that Congress never intended." *See Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Manhattan Telecomm. Corp. v. DialAmerica Mktg., Inc.*, 156 F. Supp. 2d 376, 380 (S.D.N.Y. 2001) (quotations and citations omitted). "[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." *Id.* (quoting *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)).

To allege a RICO claim pursuant to § 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, [plus (5) an] injury to property or business." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (quoting *Lum*, 361 F.3d at 223; *Sedima*, 473 U.S. at 496). The "conduct" element of RICO requires allegations that the defendant "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The defendant must "have some part in directing those affairs," and is not liable under § 1962(c)

17

"unless [she] has participated in the operation or management of the enterprise itself." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 371 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)).  The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The Supreme Court has construed the term "enterprise" broadly, only requiring a "showing [of] a 'structure,' that is, a common 'purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 368 (recognizing that the Supreme Court's decision in *Boyle v. United States*, 129 S.Ct. 2237 (2009) rejected the more stringent association-in-fact enterprise tests previously adopted by various courts of appeals that required a showing of a decision-making process or hierarchy).  Meanwhile, a "pattern of racketeering activity" under RICO consists of at least two predicate acts of racketeering activity within a ten-year period.  *Id.* § 1961(5).  Predicate acts of racketeering activity include, *inter alia*, mail fraud and wire fraud.  *See id.* § 1961(1) (citing 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 363.

As discussed above, where a RICO plaintiff relies upon mail and wire fraud as the predicate acts of racketeering, the fraud allegations must be pled with particularity in accordance with Rule 9(b).  While the heightened pleading standard of Rule 9(b) does not appear to apply to RICO elements other than a fraudulent predicate offense, those elements must still meet the general requirements of Federal Rule of Civil Procedure 8 as applied in *Twombly*.  *In re Ins. Brokerage Antitrust Litig.*, Nos. 04-5184/05-1079, 2007 WL 2892700, at * 8 (D.N.J. Sept. 28,

2007) (collecting cases).[4]

### b. Defendants' RICO Arguments

Beyond their law-of-the-case argument, which this Court rejected *supra*, Defendants challenge VSC's standing, "enterprise" allegations, and "conduct" allegations as to Macedo-Bilynsky's role in the alleged scheme.  Further, if VSC cannot show a RICO violation, Defendants argue that VSC cannot show a RICO conspiracy.  Defendants also contend that certain factual allegations made by VSC have been disproved by discovery in the *Moreira* action.

With regard to standing, Defendants contend that VSC has not suffered an injury to its business or property that was proximately caused by a RICO violation, as required by 18 U.S.C. § 1964(c), because VSC has not presented allegations or proof of a concrete financial loss, *see Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000).  Defendants argue that, "VSC was the insurer for Moreira's October 1, 2005, injury at the jobsite run by MCC under one of the two policies.  As things currently stand VSC has paid exactly what it should have paid, VSC's entire injury rests upon the presumption that some day another court will find that Moreira was not an employee and that a court will also then find that VSC was misled."  (Macedos Defs.' Br. at 23.)

As for VSC's "enterprise" allegations, Defendants assert that VSC has not shown the structure, purpose, and function that the Supreme Court held in *Boyle v. United States*, 129 S. Ct.

---

[4] Still, where "a plaintiff's claims as to any element other than the predicate offense interrelates with a fraudulent conduct that the plaintiff asserts to be the predicate offense—e.g., if the 'how' aspect of the fraud is based on defendant's use of an enterprise structure—it would indeed be anomalous for the plaintiff not to plead the structure aspect of the enterprise element with particularity while setting forth plaintiff's claims as to the enterprise but to plead the very same structure aspect with particularity while setting forth plaintiff's claims as to the predicate offense."  *In re Ins. Brokerage Antitrust Litig.*, Nos. 04-5184/05-1079, 2007 WL 1062980, at *6 n.4 (D.N.J. Apr. 5, 2007); *see also In re Ins. Brokerage*, 2007 WL 2892700, at * 8 n.6.

2237 (2009) were necessary to show an association-in-fact enterprise.  According to Defendants, VSC's allegations "state[], on its face, that the alleged 'enterprise' was essentially the employees and owners of MCC running the affairs of MCC as best as they knew how.  There is no allegation of the running of criminal enterprise qua criminal enterprise."  (Macedos Defs.' Br. at 25.)  VSC has done nothing more, Defendants contend, than "[s]imply assert[] that some of the members of the enterprise haphazardly engaged in acts that plaintiff has decided it does not like . . . ."  (*Id.*)  Defendants contend that VSC's allegations fail to show that Defendants acted in concert, or that Macedo-Bilynsky did anything more than make reasonable, *ad hoc* business decisions to file insurance claims for workers' compensation on behalf of an MCC employee.

On the matter of "conduct," Defendants challenge VSC's assertion that Macedo-Bilynsky "directed" the enterprise, noting that Macedo-Bilynsky played no part in the Peixoto-Moreira hospital meeting or Moreira's workers' compensation and state court filings.  Moreover, Defendants note that statements made in Macedo-Bilynsky's legal filings before the New Jersey Division of Workers' Compensation and the Superior Court in the *Moreira* action were made with the advice of legal counsel provided by VSC, who initially provided legal counsel for Defendants in these proceedings.

In addition to these arguments, Defendants contend that discovery in the *Moreira* action has revealed that Moreira did receive a $367.50 check from CCS, which matches the amount stated in the W-2 tax form.  (Macedos Defs.' Br. at 13.)  This fact, Defendants contends, reveals VSC's fraud claims as nothing more than a conspiracy theory.

### c.  Analysis & Conclusion

After carefully reviewing VSC's Amended Complaint and RICO Statement, and upon

careful consideration of Defendants' arguments, the Court concludes that VSC has sufficiently

alleged particularized facts that, presumed true, state a RICO claim against Macedo-Bilynsky.

VSC has provided detailed allegations that Macedo-Bilynsky, as the co-manager of MCC who

mailed and/or wired the allegedly false insurance claims and supporting documentation, directly

participated in the conduct of the enterprise's affairs.  VSC has alleged facts that plausibly

support the existence of an association-in-fact enterprise, consisting of Macedo-Bilynsky,

Macedo, Moreira, Peixoto, MCC, and CCS, that conspired to create a construction agreement

and an employment relationship in order to obtain insurance coverage for the injuries Moreira

sustained at the Parsonage Lot Property on October 1, 2005.  VSC's allegations indicate that

Defendants acts were coordinated, had shared purposes in procuring insurance benefits and

avoiding liability, and that each Defendant played a part in the enterprise.  VSC's allegations also

indicate that VSC has suffered a concrete injury of more than $300,000.

Accepting VSC's allegations as true, Defendants engaged in the following fraudulent

acts: (1) informing Moreira, while in the hospital, that MCC would cover the expenses of his

injuries (Peixoto); (2) submitting insurance claims in October 2005 asserting that Moreira was an

MCC employee (Macedo-Bilynsky); (3) preparing a putative 2004 construction agreement after-

the-fact to make it appear that MCC was the contractor on the project (Macedo, Peixoto) and (4)

submitting the same to VSC in January 2007(Macedo-Bilynsky); submitting a false W-2 tax form

to VSC in January 2007 (Macedo-Bilynsky); (5) arranging a February 2008 meeting with

Moreira and his actual employer, Dominick Reis, at the restaurant "Churrasqueira Bairrada" for

purposes of persuading Moreira to accept the workers' compensation benefits and abandon the

state court action against co-Defendants (Macedo); and (6) making false filings before the New

Jersey Division of Workers' Compensation in  and the Superior Court in the *Moreira* action that

continued the enterprise's contention that Moreira was an MCC employee on the date of his

injury (Macedo-Bilynsky).  Among these allegations of fraud, VSC has averred that Macedo-

Bilynsky committed four predicate acts of mail and/or wire fraud, consisting of her October 2005

mail and/or wire submissions of the insurance claims containing false statements and her January

2007 mail and/or wire submissions of the W-2 tax form and the 2004 putative construction

contract.  Although some of VSC's allegations lack exact dates (e.g., when the putative

agreement was executed, when the restaurant meeting took place), VSC's allegations on the

whole allege with significant precision the relevant *who*, *what*, *where*, *when*, and *how* for each of

these acts.  Furthermore, VSC alleges specific circumstantial facts that, presumed to be true,

permit a reasonable inference that each Defendant acted with scienter in committing the

aforementioned acts.  For instance, VSC alleges: (a) that Moreira was a full-time employee of D.

Reis Contracting at the time of his injuries; (b) that Moreira was hired by Peixoto to perform

carpentry services for $7,500 and began work on September 24, 2005; (c) that Moreira and

Covas were paid for their services at the Parsonage Lot Property by a personal check from

Peixoto's bank account; (d) that neither Moreira nor Covas ever received payment from MCC or

CCS; (e) that the Tewksbury Township construction permits indicate that Peixoto was the

general contractor for the residential construction project; (f) that MCC represented on its

insurance applications that it only performed commercial concrete construction work; and (g)

that the putative 2004 construction agreement between MCC and Peixoto listed the Parsonage

Lot Property as Peixoto's mailing address, despite the fact that the residence had not been completed and was not habitable at the time of the alleged construction agreement.  (*See* RICO Statement at 5–9.)  VSC also proffers an explanation for *why* Defendants engaged in this scheme to avoid liability: because Peixoto did not have a homeowner's insurance policy to cover the incident.  (*Id.* at 10.)  The Court further notes that, according to the Amended Complaint, many of Defendants are related through marriage.

Importantly, VSC has alleged particular facts permitting the reasonable inference that Macedo-Bilynsky acted with scienter.  Specifically, VSC alleges that Macedo-Bilynsky, a co-manager of MCC with knowledge of the daily administration of MCC's business, completed and submitted (via a broker) an insurance claim to VSC on October 5, 2005, that stated that Moreira was hired by MCC on the date of loss, October 1, 2005, when Moreira and Covas began work on the Parsonage Lot Property the week before, and Covas had been paid for prior services by Peixoto's personal check.  Furthermore, more than a year after the incident, Macedo-Bilynsky's answer to the workers' compensation administrative proceedings omitted responses, or simply stated "under investigation," in response to basic questions regarding Moreira's employment and injury,[5] certification to the Superior Court attested, upon personal information.  Meanwhile, more than two years after the incident, Macedo-Bilynsky certified to the Superior Court, upon her

---

[5]According to the Amended Complaint, Macedo-Bilynsky's answer in the workers' compensation administrative proceeding omitted responses to the questions "Petitioner was employed on the date alleged in the petition," and "Arose out of and in the course of employment," and responded "Under investigation" to the questions "How injury occurred," "Where injury occurred," "Petitioner's occupation," and "Date Respondent had knowledge and notice of injury."  (Am. Compl. ¶ 119.)  An addendum to the answer indicated that "Respondent puts petitioner to his proofs regarding employment, causation, and the nature and extent of permanent disability."  (*Id.* ¶ 121.)

knowledge and belief, similar statements to those she made on the insurance claims in October

2005, namely that Moreira was an MCC employee on the date of his injury, and that he was paid

by CCS.  (Am. Compl. ¶¶ 119–127.)  As noted in both the Amended Complaint and the RICO

Statement, Moreira's certification to the Superior Court in the Moreira action categorically

denied an employment relationship with MCC and CCS at the time of his injury.  (*Id.* ¶ 153;

RICO Statement at 11–12.)  Presuming these facts to be true, as this Court must on a motion to

dismiss, one can reasonably infer, in light of the aforementioned allegations, that the statements

in the insurance claim, the answer, and the certification were not a simple mistakes or mere

coincidences.

        With regard to Defendants' argument that VSC does not have standing, because it has not

suffered a concrete injury, Defendants improperly ask this Court to draw an adverse inference

that VSC's allegations are false.  Not only do Defendants ask this Court to presume that the

Parsonage Lot Property construction project was "run" by MCC, but Defendants ask this Court to

conclude that VSC has only alleged a breach of contract, because no court has made a

determination regarding Moreira's employment status or a finding of fraud at this time.  (*See*

Macedos Defs.' Br. at 23–24.)  Yet such conclusions would turn pleading standards on their head

by making VSC present proof in order to survive a motion to dismiss.  Contrary to Defendants'

arguments, VSC does not allege that Defendants simply breached a contract.  Nor does VSC

allege that MCC *ran* the construction project at the Parsonage Lot Property.  Rather, VSC alleges

that Defendants conspired to treat Moreira as an MCC employee, while knowing that he was not

an MCC employee, and knowing that MCC was not the contractor for the Parsonage Lot

Property.  VSC alleges that Defendants concocted this scheme in order to receive insurance

benefits and avoid liability for Moreira's fall.  As noted above, this Court finds that VSC has alleged facts with particularity that would support this inference.  At the motion to dismiss stage, this Court must accept such well-pleaded facts to be true.  Accepting these allegations as true, Defendants have engaged in insurance fraud, and VSC has suffered actual losses consisting of $284,697.97 in unwarranted workers' compensation benefits that it paid to Moreira and $31,891.97 that it paid defending Defendants in the *Moreira* action.  VSC need not *prove* fraud and damages at this stage, and this Court is satisfied that VSC's allegations of fraud and damages satisfy the pleading requirements of Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6).

Turning to Defendants' attack on VSC's "enterprise" pleadings, the Court notes that the Supreme Court abandoned strict structural requirements in *Boyle*, concluding instead "that the 'enterprise' element of a § 1962(c) claim can be satisfied by showing a 'structure,' that is, a common 'purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 368.  The *Boyle* Court described an association-in-fact enterprise as follows:

> an association-in-fact enterprise is simply a continuing unit that functions with a common purpose.  Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc.  Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.  Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned,

25

> unsophisticated, and brutal means may fall squarely within the
> statute's reach.

*Boyle*, 129 S. Ct. at 2245–46.  The Third Circuit recently explained that, "[A]fter *Boyle*, an

association-in-fact enterprise need have no formal hierarchy or means for decision-making, and

no purpose or economic significance beyond or independent of the group's pattern of

racketeering activity." *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d at 368 (quoting

*United States v. Hutchinson*, 573 F.3d 1011, 1021 (10th Cir. 2009)).  Here, VSC alleges that

Macedo-Bilynsky acted as MCC's liaison with the insurance company, Macedo and Peixoto

forged a construction agreement, and Moreira willfully assumed the role of MCC employee to

accept workers' compensation benefits.  The Defendants' alleged acts, while occasionally *ad hoc*,

were dependant on one another, were united in purpose, and have continued to play out over the

past five years, with Defendants maintaining their positions in both state and federal litigation.

Accepting VSC's well-pleaded allegations as true, this Court concludes that VSC has shown the

existence of an enterprise, consisting of an informal family business decision-making structure,

whose members acted in concert and with a shared purpose, and of sufficient longevity to pursue

the goals of the enterprise.  *Boyle* requires nothing more at this stage.

   The Court is also persuaded that the predicate acts alleged by VSC satisfy the relatedness

and continuity requirements for a "pattern of racketeering activity," as set forth by the Supreme

Court in *HJ Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).  Predicate acts are

related if they "have the same or similar purposes, results, participants, victims, or methods of

commission, or otherwise are interrelated by distinguishing characteristics and are not isolated

events." *HJ Inc.*, 492 U.S. at 240.  Continuity, meanwhile,

> is both a closed- and open-ended concept, referring either to a closed

period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 241–42 (citations omitted). The Third Circuit has recognized that *HJ Inc.* abandoned more formalistic inquiries determined by the number of victims and/or transactions. *Swistock v. Jones*, 884 F.2d 755, 758 (3d Cir. 1989) ("The Supreme Court's unequivocal rejection of the multiple scheme rationale makes it unlikely that the limited number of persons alleged to be victims of a scheme establishes as a matter of law that a plaintiff has failed to plead a RICO pattern."). *HJ Inc.* emphasized that "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." 492 U.S. at 242. Applying *HJ Inc.*, the Third Circuit in *United States v. Pellulo* found that a 19-month series of predicate acts presented a jury question on the issue of continuity, even though "with the exception of the $114,000 diversion, the racketeering activity charged in the indictment revolved around a single, apparently finite, scheme to defraud [a savings and loan association]." 964 F.2d 193, 210 (3d Cir. 1992) (noting that *HJ Inc.* specifically rejected the requirement of multiple schemes, and stating "[u]ltimately . . . continuity is a factual issue for the jury"). Similarly, in *Swistock*, the Third Circuit found that allegations of a 14-month series of mail fraud predicate acts, which were designed to induce a lease agreement and continuing lease payments, were sufficient to survive a

motion to dismiss.  *Swistock*, 884 F.2d at 759.  In doing so, the *Swistock* court observed that, while some pleadings might warrant dismissal prior to discovery, "in many cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery.  It may be that many of these issues will then be susceptible to resolution via summary judgment."  *Id.* at 758.

This Court finds *Pellulo* and *Swistock* instructive.  Unlike *Pellulo*, this case has not yet reached a fact-finding stage.[6]  VSC has alleged fraud, including the predicate acts of mail and wire fraud, with particularity.  Accepting these allegations as true, Macedo-Bilynsky committed at least four predicate acts of mail and/or wire fraud to further the scheme to procure improper insurance benefits over a fifteen-month period, October 2005–January 2007.  However, this Court's review of continuity is not constrained by the time period of the predicate acts.  As the Third Circuit later clarified in *Tabas v. Tabas*, the continuity inquiry focuses more broadly "on the duration of the underlying scheme."  47 F.3d 1280, 1294 (noting that the "scheme or artifice to defraud" was an element of the predicate act of mail fraud under 18 U.S.C. § 1341); *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir. 1991) ("[T]he continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice.  Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.").  Looking more broadly at the underlying fraudulent scheme, VSC has alleged with particularity numerous instances of fraud

---

[6]*Pellulo* involved the appeal of a jury verdict.  The Third Circuit found that the allegations in the indictment were legally sufficient to permit a finding of continuity, and thus did not preclude retrial of the RICO count.  *Pellulo*, 964 F.2d at 210.

occurring over a 29-month period, October 2005–March 2008, and ostensibly continuing today, with Defendants continuing to claim entitlement to the insurance benefits.  The Court further notes that, while VSC's allegations assert a single, over-arching scheme to acquire insurance benefits and avoid liability, the alleged result has been the provision of two different kinds of insurance benefits: (1) workers' compensation benefits to Moreira, and (2) indemnification of the legal expenses MCC incurred defending against the *Moreira* action.  Whether the Court focuses on the narrow time-frame of the alleged predicate acts, or the more expansive time-frame of the continuing fraudulent scheme, the Court is persuaded that VSC has sufficiently alleged facts that, presumed true, would permit a finding of closed-period continuity.[7]

Finally, to the extent that Defendants contend that VSC's pleadings fail to allege facts supporting the conclusion that Macedo-Bilynsky engaged in RICO "conduct," the Court notes that VSC does not have to allege facts showing that Macedo-Bilynsky *directed* the operation, or was the ring-leader.  Rather, the Supreme Court has stated that "conduct" only requires that "one

---

[7]The Court would make the same continuity finding even if it excluded from consideration the predicate act involving the allegedly fraudulent W-2 tax form submitted in January 2007.  As noted above, Defendants have argued that discovery in the *Moreira* action has shown this allegation to be false.  Specifically, Defendants cite deposition testimony and exhibits showing that Moreira received and cashed a check from MCC that they claim matches the amount reported in the W-2 form.  However, it would be improper for this Court to decide such an issue of fact at the pleadings stage.  Furthermore, the Court is not persuaded by Defendants' evidentiary proffer that VSC has alleged this predicate act in bad faith.  Assuming *arguendo* the fact that Moreira received and cashed a check from MCC (and ostensibly not CCS as Defendants contend), and the fact that this amount matches the amount listed on the W-2 form, these facts alone would not reveal VSC's fraud allegations to be a house of cards.  For instance, the paycheck does not dispose of the anomaly that Moreira would be hired by MCC and paid for work only on the third day of work, which coincidentally was the date of loss.  Although it is not for this Court to speculate regarding Defendants' conduct, one could reasonably infer from VSC's other allegations that Defendants issued the small paycheck and matching W-2 tax form to make the employment relationship appear legitimate.

has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184.  Such participation must be related to the "pattern of racketeering activity."  Applying *Reves*, the Third Circuit in *In re Insurance Brokerage Antitrust Litigation* explained that "the nexus element requires a plaintiff to show that the defendant participated in the conduct of the enterprise's affairs . . . through—that is, 'by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of'—a pattern of racketeering activity." 618 F.3d at 372 (internal citation omitted).  Here, VSC has alleged with particularity that Macedo-Bilynsky, a co-manager of MCC with knowledge of the daily administration of MCC's affairs, knowingly completed and submitted through an insurance broker fraudulent insurance claims to achieve the enterprise's scheme of procuring unwarranted insurance benefits and avoiding liability for Moreira's injuries.  VSC further alleges that Macedo-Bilynsky committed later fraudulent acts in forwarding a false 2004 construction agreement and a false W-2 tax form, as well as her answer and certification in the workers' compensation and *Moreira* proceedings. This alleged pattern of fraudulent acts directly contributed to the enterprise's alleged fraudulent scheme.  Accepting these well-pleaded facts as true, VSC has shown that Macedo-Bilynsky participated in the operation and management of the enterprise through a pattern of racketeering activity.[8]

---

[8]The Court is sensitive to Defendants' claim that their legal filings were made under the advice of counsel provided by VSC.  However, accepting VSC's allegations as true, the alleged misrepresentations concern issues of fact (i.e., whether MCC was the contractor on the project, whether MCC hired Moreira before the injury) that would be within Defendants' particular knowledge.  Furthermore, as this Court explains in its discussion of the litigation privilege and

### 2.  State Law Claims

VSC's Amended Complaint presents the following state law claims against all

Defendants: (1) insurance fraud in violation of N.J. Stat. Ann. § 17:33A-1 et seq.; (2) workers'

compensation fraud in violation of N.J. Stat. Ann. §§ 34:15-1 et seq. and 34:15-57.4; (3)

common law fraud; (4) unjust enrichment; and (5) civil conspiracy.  Judge Buchsbaum

considered VSC's counterclaim pleadings for each of these claims in the *Moreira* action and

decided that VSC stated claims for each of these violations.  This Court has reviewed VSC's

pleadings under the standards of Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and this

Court agrees with Judge Buchsbaum that VSC has stated proper claims for relief.

### a.  N.J. Stat. Ann. § 17:33A-1 et seq., Insurance Fraud

The New Jersey Insurance Fraud Prevention Act (IFPA) prohibits the following acts:

> (a)(1) Presents or causes to be presented any written or oral statement as
> part of, or in support of or opposition to, a claim for payment or other
> benefit pursuant to an insurance policy . . . knowing that the statement
> contains any false or misleading information concerning any fact or thing
> material to the claim; or
> . . .
>
> (3) Conceals or knowingly fails to disclose the occurrence of an event
> which affects any person's initial or continued right or entitlement to (a)
> any insurance benefit or payment or (b) the amount of any benefit or
> payment to which the person is entitled;
>
> (4) Prepares or makes any written or oral statement, intended to be
> presented to any insurance company or producer for the purpose of
> obtaining: . . . (b) an insurance policy, knowing that the statement
> contains any false or misleading information concerning any fact or thing
> material to an insurance application or contract; or

---

*Noerr-Pennington* doctrines, *infra* Part IV.C, none of Defendants' legal filings are vital to VSC's
insurance fraud claims.

(5) Conceals or knowingly fails to disclose any evidence, written or oral, which may be relevant to a finding that a violation of the provisions of paragraph (4) of this subsection a. has or has not occurred.

N.J. Stat. Ann. § 17:33A-4(a)(1)–(5); *see also Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 172 (2006).  VSC has alleged facts permitting the inference that each Defendant, including the corporate Defendants through their officers, violated IFPA provisions.  To recap the key elements of VSC's fraud claims against Defendants, VSC alleges that Defendants Macedo (claim questionnaire in October 2005) and Macedo-Bilynsky (insurance claims in October 2005) knowingly submitted or caused to be submitted statements containing materially false information in support of claims for benefits under MCC's insurance policies.[9]  VSC alleges that Peixoto and Macedo prepared a writing containing materially false statements (2004 construction agreement) in order to support MCC's insurance claims on Moreira's behalf.  Meanwhile, VSC alleges that CCS issued a false W-2 tax form, which Macedo-Bilynsky submitted to VSC to support the insurance claims.  For the reasons discussed in the RICO section, *supra* Part IV.B.1,

---

[9]Moreira contends that VSC's claims against him must be dismissed because his only alleged act was a misrepresentation of his employment status, which is not actionable as fraud.  Moreira's position relies on Judge Greenaway's September 29, 2009 opinion.  However, as this Court explained in its discussion of the law of the case doctrine, *supra* Part IV.A, the disputed portion of Judge Greenaway's opinion does not contemplate the breadth of VSC's particularized allegations of fraud, and therefore does not control here.  VSC has alleged that Moreira, in October 2005, stated he was an MCC employee on a questionnaire supporting his claim for benefits under MCC's workers' compensation insurance policy, but two years later in the *Moreira* action, Moreira certified that he was told of this arrangement while he was in the hospital, and that he never understood MCC to be his employer.  Accepting these well-pleaded allegations and Moreira's admissions as true, in the context of the broader insurance fraud scheme alleged by VSC, the circumstances do not suggest that Moreira simply gave a mistaken lay opinion on a matter of law.  Rather, one could reasonably conclude that Moreira knowingly participated in the fraudulent scheme by acknowledging an entire employment relationship that never existed.  Judge Buchsbaum ruled in his June 11, 2010 opinion that such conduct was actionable as fraud under New Jersey law.  (Mills Decl. Ex. D at 14 (citing *Westervelt v. Demarest*, 46 N.J.L. 37, 40 (1884)).)  This Court agrees.

32

this Court finds that VSC has alleged the instances of fraud with particularity.  Consequently, the Court finds that VSC has stated a claim against all Defendants under the IFPA.

### b. *N.J. Stat. Ann. §§ 34:15-1 et seq. & 34:15-57.4, Workers' Compensation Fraud*

New Jersey's workers' compensation law provides that it shall be unlawful for a person to purposefully or knowingly "[m]ake[], when making a claim for benefits pursuant to R.S.34:15-1 et seq., a false or misleading statement, representation or submission concerning any fact that is material to that claim for the purpose of wrongfully obtaining the benefits."  N.J. Stat. Ann. § 34:15-57.4(a)(1).  As noted above, VSC alleges that Defendants submitted the aforementioned questionnaire, insurance claims, false W-2 tax form, and false construction contract as part of an on-going scheme to secure workers' compensation benefits for Moreira from MCC's insurance policy.  VSC has alleged the incidences of fraud with particularity.  Accordingly, the Court finds that VSC has stated a claim against all Defendants under New Jersey's workers' compensation law.

### c. *Common Law Fraud*

Under New Jersey law, the elements of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172–73 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)).  As noted above, VSC alleges that Defendants submitted the aforementioned questionnaire, insurance claims, false W-2 tax form, and false construction contract as part of an on-going scheme to secure workers' compensation benefits for Moreira from MCC's insurance policy.  Presuming the allegations to

be true, these acts involved material misrepresentations of present and/or past facts, with knowledge of the falsity of these statements, with an intention that VSC would rely on the statements, leading VSC to reasonably rely on the statements and suffer damages by paying unwarranted insurance benefits.  VSC has alleged the elements of the fraud with particularity, and has pled sufficient facts to permit a reasonable inference that Defendants acted with knowledge of the statements' falsity and intent that VSC would rely on the statements.  Thus, the Court finds that VSC has stated a claim against all Defendants for common law fraud.

### d. Unjust Enrichment

To state a claim for unjust enrichment under New Jersey law, "a plaintiff must show that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994) (citations omitted).  Here, VSC alleges that Defendants jointly committed fraudulent acts to procure two forms of insurance benefits: (1) workers' compensation benefits for Moreira, and (2) indemnification for MCC's legal defense expenses arising from Moreira's workers' compensation and state court claims. Accepting these well-pleaded and particularized allegations as true, all Defendants benefitted from this scheme—Moreira received workers' compensation benefits, Peixoto temporarily avoided liability, and the Macedos Defendants received money for their legal expenses. Retention of these benefits would be unjust in light of the alleged insurance fraud scheme. Therefore, the Court finds that VSC has stated a claim against all Defendants for unjust enrichment.

### e. Civil Conspiracy

Civil conspiracy in New Jersey consists of "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular*, 184 N.J. at 177 (quoting *Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (App. Div.1993)). A plaintiff need not show an express agreement.  "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Banco Popular*, 184 N.J. at 177 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988)).  "Most importantly, the gist of the claim is not the unlawful agreement, but the underlying wrong which, absent the conspiracy, would give a right of action." *Banco Popular*, 184 N.J. at 177–78 (internal quotation marks and citations omitted).  VSC's pleadings assert that Defendants formed an enterprise to secure unwarranted insurance benefits and acted in concert to achieve those goals.  Accepting VSC's well-pleaded allegations as true, Defendants had knowledge of the general objectives of the scheme and implicitly agreed to participate in the scheme.  As a result, VSC avers that it has sustained actual damages in excess of $300,000.  Absent this conspiracy, the alleged independent acts of insurance fraud would be actionable.  Consequently, the Court concludes that VSC has stated a claim for civil conspiracy against all Defendants.

### 3. Declaratory Judgment Claims

VSC's declaratory judgment claims present alternative grounds for relief, because they seek to rescind MCC's insurance policies on the grounds of fraud in the application and fraud in

35

the submission of claims.  The latter fraud-in-the-submission claims speak to the same

misconduct alleged by VSC's other fraud claims.  The Court concludes that VSC has stated a

claim for relief on these claims, because, as noted above, this Court finds that VSC has alleged

these fraud claims with particularity.  However, the fraud-in-the-application claims appear to

presume alternative circumstances wherein MCC actually was the contractor on the Parsonage

Lot Property.  In that event, VSC alleges that MCC knowingly concealed that it performed work

on residential projects when its insurance application stated that MCC worked exclusively on

commercial concrete construction projects.  VSC contends that such an omission would be

material, and that it relied on MCC's application representations to its detriment.  So far as the

Court can tell, Defendants do not appear to present distinct arguments supporting dismissal of

VSC's declaratory judgment claims.  The Court finds no sound basis to dismiss these alternative

claims at this time.

### C.  Litigation Privilege & Noerr-Pennington Doctrine

The last substantive points this Court must address with regard to VSC's fraud claims are

Defendants' arguments that the litigation privilege and *Noerr-Pennington* doctrine bar the

portions of VSC's claims that are predicated on Defendants' legal filings in the workers'

compensation and *Moreira* proceedings.[10]  Defendants construe VSC's Amended Complaint to

---

[10]The litigation privilege in New Jersey refers to an absolute privilege and immunity that
is accorded to "[a] statement made in the course of judicial, administrative, or legislative
proceedings . . . .  That immunity is predicated on the need for unfettered expression critical to
advancing the underlying government interest at stake in those settings."  *Erickson v. Marsh &
McLennan Co., Inc.*, 117 N.J. 539, 563 (1990) (citations omitted).  This privilege applies to "any
communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other
participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some
connection or logical relation to the action."  *Hawkins v. Harris*, 141 N.J. 207, 216 (1995).  The
*Noerr-Pennington* doctrine derives from the Supreme Court's decisions in  *Eastern Railroad*

treat these legal filings as separate actionable frauds, which must be struck on First Amendment and privilege grounds.  However, this piecemeal deconstruction of VSC's claims overstates the import of these allegations.  So far as the Court can tell, VSC does not contend that Defendants' legal filings in and of themselves constitute actionable instances of fraud.  Rather, VSC contends that Defendants designed a scheme to obtain insurance benefits, that Defendants knowingly made material  misrepresentations and created false documents to accomplish this goal, and *then* when Moreira filed the workers' compensation and *Moreira* proceedings, the Macedos Defendants maintained these representations in their legal filings in an attempt to preserve the underlying scheme, while Moreira categorically rejected them.

Each of VSC's fraud claims, including RICO, could stand on its own in the absence of the allegations concerning Defendants' legal filings.  Accepting the allegations as true, there would still be sufficient red flags—such as MCC's statement of an exclusively commercial concrete business on its insurance applications, the Tewksbury construction permits, the assertion that Moreira was hired on the day of loss as opposed to the day he began work, and the address on the putative construction contract—to permit the reasonable inference that Defendants engaged in insurance fraud.  The legal filings do not make or break VSC's fraud claims. However, Defendants' statements in legal filings might have evidentiary value in revealing the true nature of Defendants' conduct and motives throughout the alleged scheme.  Under these circumstances, the germane question is whether the litigation privilege and *Noerr-*

---

*Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ("Noerr"), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ( "Pennington"), which recognized that an individual is immune from liability for exercising his or her First Amendment right to petition the government.  *See, e.g.*, *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159 (3d Cir. 2001).

*Pennington* doctrines preclude VSC from presenting evidence of Defendants' legal filings to support their claims of insurance fraud. The parties' briefs do not adequately address this discrete issue, and this Court need not issue a final ruling on this evidentiary issue at the pleadings stage. The parties will have an opportunity to address these issues either at the summary judgment stage or through pre-trial motions *in limine*.

### D. Summary

For the aforementioned reasons, the Court finds that VSC has pled RICO and state law fraud claims with sufficient particularity to survive dismissal at this stage. The Court agrees with Judge Buchsbaum that Judge Greenaway's September 29, 2009 opinion does not control the amended claims, and that the litigation privilege and the *Noerr-Pennington* doctrine does not bar VSC's claims. Consequently, the Court will deny Defendants' renewed motions to dismiss. Today's ruling only addresses the sufficiency of the pleadings. Naturally, VSC will need to present adequate proofs to permit a reasonable fact-finder to conclude that VSC has shown the requisite elements of each of its fraud claims in order to survive any subsequent motions that may be brought after discovery. The parties are directed to contact the Magistrate Judge to set a scheduling conference.

## V.      REAL PARTY IN INTEREST

During the briefing of the renewed motions to dismiss, Defendant Peixoto filed a reply brief that challenged VSC's interest in the insurance claims, arguing that VSC concealed the real party in interest. From the parties' representations, it appears that, in November 2006, VSC assigned its rights and responsibilities under its insurance policies to Old Republic Construction Program Group, Inc., (ORCPG) and authorized ORCPG to sue or defend in VSC's name in

actions arising from VSC's insurance policies.  VSC submits that this case was brought in VSC's name at the direction of ORCPG, as contemplated under the assignment agreement. (VSC Letter of Dec. 7, 2010 & Ex. 1 ("Assignment Agreement").)

Peixoto has not shown that VSC lacks a real interest in the outcome of these proceedings. Federal Rule of Civil Procedure 17(a)(1) states that "[a]n action must be prosecuted in the name of the real party in interest."  "This rule requires that the party who brings an action actually possess, under the substantive law, the right sought to be enforced."  *United HealthCare Corp. v. Am. Trade Ins. Co., Ltd.*, 88 F.3d 563, 569 (8th Cir. 1996).  This rule serves "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."  Fed. R. Civ. P. 17, Advisory Committee Note.  Defendants do not appear to dispute that VSC issued the relevant insurance policies, or that VSC began payment of the workers' compensation benefits under the insurance policies.  "It is settled law that an insurer, whether it has paid all of the loss or only part of the loss, is a real party in interest under Rule 17(a)."  *Hancotte v. Sears, Roebuck & Co.*, 93 F.R.D. 845, 846 (E.D. Pa. 1982) (collecting cases).  Furthermore, it appears that the Assignment Agreement authorized ORCPG to sue or defend in VSC's name in cases arising under VSC's insurance policies.  The Court concludes that Peixoto has not made a proper showing that VSC is not a real party in interest at this time.[11]

---

[11]Even if Defendants had made a proper showing that VSC was not a real party in interest, the appropriate remedy would be to allow a reasonable time for the joinder of a real party in interest, not dismissal.  *See* Fed. R. Civ. P. 17(a)(3) ("The Court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.").

**VI.    CONCLUSION**

For the foregoing reasons, the Court will deny Defendants' renewed motions to dismiss.

An appropriate form of order accompanies this Memorandum Opinion.

Dated: May 6, 2011

                                        _____/s/ Garrett E. Brown, Jr._____
                                        GARRETT E. BROWN, JR., U.S.D.J.